We are on U.S. v. Lucio Ambriz-Gonzalez. Both counsel are present. Mr. Cerno is here representing the Assistant U.S. Attorney from San Diego. Mr. Timothy Scott is here as well. You are the appellant. Mr. Cerno Thank you, Your Honor. Good morning, Your Honors. Timothy Scott on behalf of the appellant, Mr. Ambriz-Gonzalez, may it please the Court. Your Honor, there are three primary reasons why we're asking for reversal in this case. The first is that the government witness attributed Spanish-language incriminating statements to Mr. Ambriz-Gonzalez, but Mr. Ambriz-Gonzalez was unable to confront him and test him, test the witness, to determine, in fact, whether he spoke Spanish at all and could accurately convey these incriminating statements, and then, secondly, whether he gave proper Miranda warnings, warnings that complied with Miranda's provisions. That's the first error we assigned. The second, Your Honors, is that the second is a matter of even if the Miranda warning was sufficient and even if there was language proficiency, United States v. San Juan Cruz called for the suppression of statements anyway because the agent juxtaposed contradictory Miranda warnings and immigration warnings, and the San Juan Cruz opinion directly controls and should have resulted in suppression. And then, finally, the district court in this case was faced with unmanageable court congestion and had no ability to set a trial date within the Speedy Trial Act, the 70 days required. What the district court did is set a date 130 days beyond indictment, and ultimately, the case was heard 145 days beyond indictment, but the district court declined to rule on motions under the belief that simply leaving motions pending would keep the date within compliance of the Speedy Trial Act. All three grounds require  As to the first, Your Honors, the language issue, the government attributed incriminating statements to Mr. Ambrose Gonzalez in the Spanish language. Both at the statements hearing and at trial, Mr. Ambrose Gonzalez was simply unable to test the agent to determine whether or not he actually spoke Spanish. And to be clear, Your Honor, we didn't propose to have the case agent read from a dictionary or have him answer grammar questions or do a pop vocabulary quiz. What we simply asked was that in the context of a statements hearing, that a contemporaneous record be made to suggest, or not to suggest, but to show exactly what words were used and whether those complied with Miranda, whether the four admonitions were actually given and then were given in language and the sounds that were made were comprehensible to a Spanish speaker. So what is – now, remind me, did the police officer say that he had read this out of the warning off a card? He did. He read it off a card. So did you propose to have him read the Miranda off the card? Essentially, that would have been – that was what I proposed and what I wanted him to do. And then you wanted the translator to translate that and see whether the translator could get it correctly. Essentially, we asked him to actually use the foreign language words that he said he used with Mr. Ambrose Gonzalez, and then to the extent that that made sense in Spanish, then the interpreter would create an English record so that this Court, most importantly, could conduct de novo review to see if the four warnings, in fact, complied with Miranda, to see if he actually did give proper Miranda warnings. So to that extent, yes, it would be a court-certified interpreter. Isn't that the rough equivalent of qualifying the interpreter, the translator, as an expert witness? I could see that argument in a sense. We are relying to some extent on the interpreter's expertise to create a record of what was said. But I think at the end of the day, it is a court-certified interpreter. And certainly, at least from the appellant's perspective, we would much rather rely on the court interpreter's record and interpretation than relying on Agent Mark's word as to what he actually said. And parenthetically, this same procedure is used any time a witness testifies in Spanish. And it's frequent in the Southern District that either a material witness in an alien smuggling case or a fact witness in virtually any of the border busts, excuse the word, a Spanish-speaking witness testifies, it's a fairly common procedure for the court interpreter then to stand next to that witness and create an English transcript of what was said. Now, ordinarily, that's in front of the jury, so the jury can hear what the witness is testifying to. But in this context, we would need it also for the Miranda warnings themselves and also to get a full context of what was said. Isn't this a really abuse of discretion question in terms of the district court's exclusion of this? I mean, it seems to me there was really no foundation that necessarily called into question the speaker's ability with Spanish. Everything was to the contrary. It was first in his class. He used Spanish daily in his routine, et cetera. So why would it be an abuse for the court to say, look, if we're going to have to have double interpreters every time that there's a Spanish-speaking agent in the Southern District of California, we might as well just, you know, hire every Spanish-speaker in the United States to come in here and be an interpreter, because we'll shut down the court system, we'll triple the time for every trial. So I'm having a little trouble understanding why it would be an abuse to say, from everything I've heard, I'm going to cut it off at the pass. Well, I would argue, Your Honor, that initially it's de novo review whether the agent provided language that conveyed the Miranda warnings. Right. And for that reason, we can't simply rely on the agent saying, I gave Miranda warnings. We have to actually have a record of what those warnings were so that this court can conduct the de novo review. That's de novo review of that, but the judge's decision as to what evidence to let in so we can make the de novo review, isn't that an abuse of discretion standard? Well, I would argue that because it's preliminary, because we actually have to have some record in order to make the decision, then ultimately it's considered de novo review. But to take the court's point, if the court was inclined to consider it abuse of discretion, I would argue that it would simply not take an undue amount of time. And it wouldn't be onerous to simply say, usted tiene el derecho, and speak a few words of Spanish into the record. If the agent really was proficient, it would take but a few moments. And that's exactly what happens when somebody does testify. So I would respectfully disagree that it would triple the time for a trial. It would take but a few moments. And I submit those would be moments well spent, particularly when constitutional rights are at stake. Simply put, we would argue that because Mr. Ambrose Gonzalez speaks Spanish instead of English, we shouldn't be left with the agent's word that he did give proper warnings. Mr. Ambrose should be able to have those warnings contained in the record. If the officer read the card, then couldn't he just bring the card and say, here's the card, and I read every word off the card, and now we submit the card as an exhibit, and it can be read into the record, and everybody can look at it to see whether and this court could examine it as part of the record to see whether it complied. In the same way that an English-speaking officer saying, I gave the warning in English and I always read it, even though I haven't memorized it, I always read it, here's the card. And until your client puts into question that he didn't understand the warning. But that's a different argument, and one that your client came close to making. You were willing to proffer that, but you weren't willing to have Mr. Ambrose Gonzalez take the stand and say, I didn't understand a word he said. I know I was nodding, but I was just being polite, right? I think there's two levels to the analysis of what it was. It was a Spanish language statement of rights. Essentially, my understanding is that it's a two-sided card, and this is my recollection of it. And the first side has the Miranda warnings in English. The second side is Spanish. According to the agent. And why I say there's two levels of analysis to it is first. Did you see the card? I saw the card, and I'm not going to represent to the Court that the English version didn't comply with Miranda, but my recollection is it probably did. How about the Spanish version? I don't know, and this Court doesn't know. The problem is the agent didn't lay the foundation that the second side actually is a mirror Spanish image of the first side. Was it a government document? It's a Border Patrol agent document. I believe it's called the I-214. But it would have been easy enough for you to have asked to have it placed in the record and then examine it, and then you would have an opportunity to challenge that. And that's why I say to the second part of the analysis, it's one thing if somebody lays foundation, whether the defense, although we would argue it's a government's burden, but then beyond that, whether that card was utilized proficiently. Just by way of example, and I hope this doesn't sound glib, if I had a card in perfect Russian with perfect grammar and it was flawless, I would still be helpless if I was trying to make sounds in Russian that made sense to a Russian speaker. So even if we were to assume that the card is in perfect Spanish and does comply with the law, we would need to discover whether this agent does have the ability to make sounds that make sense in Spanish. But we would have the same problem in English, though, wouldn't we? Even if we had a native English speaker, and we had an English card that he purported to have read from, we would want to make sure that he hadn't mumbled, that he hadn't spoken too soft as a way of deterring somebody from exercising their rights, that there hadn't been some kind of fraud, hadn't sort of read every other word and whispered every other word so that the whole message was garbled. I mean, there's a number of scenarios that we could create, all in English with native speakers, up one side and down the other. I suppose so, but I would say that that's less stark than completely prohibiting someone from demonstrating. I'll tell you, that's not a great issue. You've got more than anything else you want to say. You have two other issues. That's feeding trial. Let me ask you, because I think your better issue is the one related to San Juan Cruz. And if you are correct that this Miranda warning timing makes the case fall within San Juan Cruz, we still have to figure out whether it was harmless or not. Would you address the second part, harmlessness? The harmlessness, certainly, Your Honor. To begin with, one of the government's key premises is that there were identical statements given in the field as well as post-Miranda, and that even if the court suppresses post-Miranda, there are identical statements in the field. With due respect, that's an error to suggest that. On pages 100 through 101 of the ER are the statements in the field, so to speak. And then on pages 103 to 104 are the statements that were given post-Miranda. The statements in the field are limited, and again, this is according to Agent Marks, to the fact that Mr. Ambry said he was from Mexico, that he didn't possess immigration documents at that time permitting him entry. We presume that that's an LPR card or a MECA. And then thirdly, that he was going to Lindsay, California. Those are the three statements in the field. In contrast, the post-Miranda statements included those things, but also — Well, in the field, he told them he wanted a lawyer, but he had to get his own. Well, that was actually back at the station, Your Honor. Back at the station. Correct. And the government relies heavily on the statements in the field to suggest harmlessness. Back at the station, the statements attributed to Mr. Ambry Gonzalez were more elaborate and more damaging. They included a statement — this is pages 103 to 104 of the ER — that he had used an alias previously, and the government used that to tie his name into immigration documents from the A-file. He said that he had been deported before. Now, deportation, of course, is one of the elements of the offense, and it's an element that was completely not addressed in the statements in the field. So the government gained an entire element of the offense and used that heavily against him in their closing arguments. So that was something that occurred post-Miranda that did not occur pre-Miranda. Which element was that? Deportation. Oh, the deportation. Correct. Mr. Ambry Gonzalez said nothing about deportation in the field, but according to Agent Marks, did say something about deportation post-Miranda. What should the INS have done here? What should the Border Patrol have done? Under San Juan Cruz, they simply should have, when they decided to do a criminal prosecution, told Mr. Ambry Gonzalez, the immigration warnings that we gave you before don't apply anymore. Please set them aside. Now, you have the right to an attorney free of cost that will be appointed to you. Just a few moments to clarify that for the criminal prosecution. That's not exactly what Miranda says. Miranda says, if you cannot afford an attorney and you wish one, then you may, then one may be appointed for you. Very well. And the Miranda warning was given. Of course, that's the subject of your first point. But assuming that the Miranda warning was appropriately given in Spanish, why isn't that a corrective instruction? To the extent that there's a conflict between the administrative instructions, to the extent we're getting conflicting instructions, we've gotten them three hours apart. Why isn't the second one the one that should stick? So if we're concerned about what comes in post-Miranda, at least he's been properly given an instruction that says, you can have an attorney appointed for you if you wish one. The problem, Your Honor, is that he's given both statements. And they're one after the other. And although the government argues that there's time in between, the San Juan Cruz court held explicitly that the issue of time is not dispositive. And the holding of San Juan Cruz is when contradictory warnings are given, whether before, simultaneous, or after the Miranda warning. The onus is on the government to clarify the difference between the two. And that was the exact fact pattern from San Juan Cruz. The agent said that he gave Miranda second. Now, whether it was a few moments later or a few hours later, San Juan Cruz was very, very clear that the onus is on the government to clarify. And the record is clear that the agent Marks did nothing to clarify. He simply read the two contradictory warnings. And then left it up to Mr. Ambrose Gonzalez to determine whether or not, which one to believe, essentially, and which one applied. So let me ask you this. I know that the timing wasn't dispositive in San Juan Cruz. But if you get the administrative warning today and you get the Miranda tomorrow, do you think that matters? As the time goes on, perhaps the argument would be stronger that a fresh encounter on a new day, maybe the government could argue that that would then dissipate any problem with the former warning. But in this case, where they're literally one after another in terms of the agent's contact with the person, and it is still within the same custodial setting, again, I rely very much on San Juan Cruz, which says the onus is on the government to clarify. So it's – it really is their responsibility, once they've given two separate warnings and two contradictory warnings, to clarify it for a person like Mr. Ambrose Gonzalez. Thank you. Now, in terms of harmlessness, if I could step back. My first argument was that there were actually new elements of the offense and new information contained in the Miranda statements. But secondly, our argument that we couldn't determine the agent's proficiency in Spanish undermines both statements. The fact is, at trial, Mr. Ambrose Gonzalez was not allowed to confront the agent any more than he was at the motion hearing. The Court will recall that at the motion hearing, the district court said whether he speaks understandable Spanish is a question for the jury. And then at the jury trial, he said, whether the agent speaks Spanish is something that I already determined as a legal issue, and I'm not going to let you cross-examine either. The reason it's important is because under Model Jury Instruction 4.1, the jury is charged with determining, number one, whether an incriminating statement was made at all, and then, number two, the circumstances surrounding the statement and how much weight to give to the statement. It's our position that the jury can't be fairly asked to evaluate whether it was really made, and secondly, what weight to give it if they can't hear whether this is the foundation to speak and understand Spanish at all. It's important to recall that the agent testified that he wouldn't try to speak Spanish from memory, that he himself relied heavily on paper cards or documents to read Spanish to Mr. Ambrose Gonzalez. He also testified that he would, quote, paraphrase some of these portions, despite his testimony that he wouldn't feel comfortable speaking from memory. What's important is that, presumably, whatever interchange between Mr. Ambrose and Agent Marks took place wasn't contained on a preprinted card. So directly at issue is not only his ability to speak in Spanish, but his ability to understand Spanish, then translate that into an English report, and then give that English version of Mr. Ambrose Gonzalez's testimony at trial. So our argument fundamentally is because we weren't allowed to just see if he can speak Spanish at all, the first statements are suspect under the Confrontation Clause, and the second statements are suspect under the Confrontation Clause. How about the speedy trial? Do you want to talk about that? Certainly, Your Honor. But, you know, you've got to keep moving quicker. Okay. Fair enough, Your Honor. Thank you. Under speedy trial, the district court fundamentally was faced with the problem that it couldn't give a date that complied with speedy trial. At the first motion hearing, the defense appeared, I appeared, and I said, we're ready to proceed with motions today. The Court said, well, do we have a trial date? I said, no, we need a trial date as well. And upon learning that a trial date had not yet been set, the district court set a trial date that was far beyond the strictures of speedy trial, and then said, I'm not going to rule on motions yet. I'm going to resolve them shortly before trial. Now, my main problem, and imagine my horror in reading the transcript, is that at the end of that hearing, for no good reason at all, after the district court had twice said, I'm not going to hear motions today, I said, that's fine, Your Honor. That's fine to hear motions today. And I said that. There's no question about it. The question now becomes, what bearing does that have on speedy trial? Did I waive the issue? And legally speaking, the defense cannot waive a speedy trial issue. The government points to Shetty and to Sutter to suggest that the defense can waive speedy trial. But in Shetty, the defense specifically stipulated to facts underlying an exclusion of time for an ends of justice exception. And then in Sutter, the district, or excuse me, the defendant specifically said that we need a hearing to resolve it, and sort of colluded with the government and the district court to keep speedy trial open. Now, in this case, nobody asked me if I agreed to exclusion of time. No one asked what I thought about it. And I certainly didn't request a continuance. And you were thinking about proficiency in Spanish. Probably. Probably what I was thinking about was my calendar. And it probably worked for my personal calendar. But the fact is that that shouldn't be taken out on Mr. Ambrose Gonzalez or society, which is the other party that speedy trial is supposed to protect. So ultimately, the defense can't waive a speedy trial act. And I should point out that in the Ramirez-Cortez case, which I think came down in 2000, if I'm not mistaken, the defendant actually moved for a continuance. And twice, on two occasions, was the one who motivated the delay. And I think that in this case, I didn't do anything like that. Now, there's two reasons why under speedy trial, the case should have been dismissed. One, well, there's actually three, but I think in fairness, the weather, the delay resulted from motions. It's dismissed without prejudice. It's a question I think that we could either brief for the court or brief for the district court if it is reversed with instructions to dismiss. It's not something that I've yet approached in my briefing. That's my understanding. It's dismissed and then the government can go up and get a superseding indictment and get back where you started. I imagine that there's that argument to be made and they could do that. As I say, it's something I didn't address. Ultimately, I think it's important that the district court apparently earnestly believed that as long as motions were left unresolved, that it was fine to continue the trial date beyond the strictures of speedy trial. Now, December 2nd, when the court first set the dates out, I think that it's fair to infer that from the record when the court said, well, today do we have a trial date, and that's sort of circumstantial, I'll grant that. But given what happened after that, on February 24th, I believe, when the court just explicitly said, I don't have a trial date to give, I'm going to continue trial and I'm going to continue motions, there's court congestion, I find that to be good cause, and I leave motions pending. And then the same thing happened on March 6th and March 7th. Now, on March 7th, I argued to the district court, and I'll be it gently, because I was telling the district court that it was impermissibly leaving motions unresolved, but I did say explicitly the same thing happened in December. The court didn't have a date to give, and so it kept motions pending for that reason. Now, instead of the district court, you know, accusing me of misrepresenting the facts or being deeply offended that I said that, the district court was candid and said we had a judge that was sick, we didn't have visiting judges, there were other trials that had to go, and, you know, there was no intent to violate speedy trial. You covered all that in your brief. Very well. Okay. Very well. Anything else? Have a seat. Thank you, Your Honor. Well, ladies, I would like to address the San Juan Cruz argument first, and directing the court's objection first to the harmlessness here. True or not, there was no clarification. If you're going to look in the record for a situation where the agent said, all right, Mr. Embree, I told you of your administrative rights, and I'm going to tell you what your criminal rights are. That's not fair. You're not going to find that. But what you do find is, number one, that the defendant did make some of the same statements in the field, and those are not contested here. Secondly, you have the eighth file which was introduced, which has all of the elements that we're talking about here set forth graphically. And so you have two pieces of evidence, one of the eighth file, and secondly, you have the statements that are made in the field. I think the only thing he identified as not being in the field statements as an element was the deportation, which would be in the eighth file. Is that correct? Absolutely. So I guess there's no other elements. There's nothing left to prove. When you introduce the eighth file, that has all the elements, and conceivably, we can prove it just with the eighth file, and we have done that in the past. Now, with regard to whether or not there was a situation where the clarification not being fleshed out was something that was harmful in this case, what you find is, well, first of all, let me say this, that this issue was not raised until argument on the motion. It was not in any way brought up in any written document, and it was not brought forth until ER 880. And all of a sudden, the court and the governor stopped that put it. And then you add a testimony about it, and the question as to whether or not there was a clarification is not fleshed out in the examination of the agent. You brought it back, and you look at ER 8190, and you don't find any kind of clarification question being raised there either. But what the record does show is this. You have, by its very nature, a 1326 charge implies that this individual, one, has had prior contact with U.S. law enforcement, that is, has been convicted, and two, has had prior contact with immigration, that is, has been deported. So you've got an individual here who has been through the drill at least once, and in this particular case, he has been through the drill more than once. He's got an extensive record, and you find that at PSR 4 through 5, and he's got two deportations, one in 96 and one in 2002. So where does that take us? What it takes you is you're not dealing with some naive fool who doesn't understand what his rights are. This is an individual... Well, I mean, that's speculative. I mean, I've given people Miranda rights that stand before me, and, you know, I can read it to them, and I'm not so sure they really know what I'm talking about. But... You know that. I understand that, and you can certainly make that argument about any defendant, that they don't really understand what you're saying. They don't really know what you're talking about. Well, then why give Miranda rights at all? Because it teaches law enforcement to have respect for people's constitutional rights. And they do it, and... That's the whole purpose of it. And that was done here. And not to evade. And that was done here. And, in fact, it was done in a way that the agent tells you that he, when he gave the rights, he would give the first right and ask... When he first found these guys, as I recall, they were hiding under bushes. Yes. Did I say? Yes, they were. And he knew that they were crossing because he got the sound equipment out there. Yes, he did. So he caught them red-handed, right? He absolutely did. So why didn't he give them the Miranda rights right then and there? He asked them the field interrogation questions, which are the biographical kinds of questions which do not require, under this Court's case law, do not require Miranda warnings. Well, were they free to leave? If they had answered, yes, we have documents to be here, and yes, we're just walking around, they might have been able to leave. We're just hikers. That happens down there. We're just hiding under the bushes. That happens. And we've got all our A-16 equipment with us. I mean, I don't know why they just don't give it to them right then and there. Well, they don't, and the point is that that's not an issue in this argument. Let me ask you another question. You think that in most of these cases that you can just put in the A file and rest? I would suggest that we might be able to do that, yes. Why not do that? Because if we've got more, we're going to use it. What? If we have more evidence, we're going to use it. Well, you know, we had the great deluge of raptivation cases. You remember those days, don't you? Yes, I do. You know, and the smart U.S. attorneys would take about two minutes to put on their case. And I did. To put in the file and rest. I did that. Yeah, well, I know you're smart. But I wonder why there's all that congestion down in San Diego, and there always has been. I went down there sometime in, I don't know, 68 or 69. And they had the problem then. It's worse now. So wouldn't it be better on these cases just to put the file in? And you know the defendant isn't going to take the stand. That's the end of the case. Well, I certainly. One every five minutes. Well, I can certainly bring that up with the people who do that sort of work and talk to them about it. But let me, let me, but I digress. Once again, when the Miranda warnings were given in this case, after each right was given, the defendant was asked, do you understand them? And he said yes. And that was done after every single right. This defendant did not ask any questions. He signed a written waiver which was presented, which was explained to him, and he signed it. So clearly, that's what you do have in the record concerning whether or not he understood his rights. That was in Spanish. It was explained to him in Spanish, yes. Was the waiver in Spanish? Well, he wasn't. No, he didn't read it. It was read to him. Read to him. But was the waiver itself in the Spanish? Oh, I don't know the answer to that, and the record doesn't show that. Now, also I'd like to submit that the San Juan Cruz case is distinguishable from this one in that the court in San Juan Cruz found that under the totality of the circumstances, the back-to-back warnings, the gentleman being handcuffed to the chair, being put in that stressful situation, that it was a confusing situation. In this situation, you don't have that. You have him warned of his administrative rights. Three and a half hours later, after, again, he's sat in a cell just by himself, he is given the Miranda warning, and the administrative processing had been completed without any stress. Then the interrogation was regarding the criminal. And once again, we had to... Let me stop you on that. I didn't think in San Juan Cruz that they mentioned handcuffing, but they didn't tie it to anything. I'm having a little trouble understanding why if you get one warning now, and then later you get handcuffed, you suddenly get smart, and you can now reconcile the conflicting warnings. Well, if I left that impression, I'm sorry I did. No, the point was in San Juan Cruz, the gentleman was seated in a chair, was handcuffed to the chair, and was, one, given the administrative admonition, and, according to the opinion, soon thereafter was given his Miranda warnings. The instructions were read to him one after the other. And the Court in San Juan Cruz found that the totality of the circumstances said that that or told that Court that that was a stressful situation in which somebody could not be expected to sort this whole thing out. We don't have that here. So he wasn't under stress when he's put in this cell? Well, he... Three hours later, he is... Somebody's telling him, you know, you have a lawyer, but no, you don't. You can get a lawyer, no, you can't. I mean, you know, he's somehow magically not under stress? He... Well, obviously, if you're sitting in a cell, you're under a greater level of stress than if you were not. But they have music in there to complement that. Well, I doubt that. But he's certainly not under the kind of stress as we see in San Juan Cruz. He is obviously, he's being detained. He's obviously, he obviously knows either... Why do you need this if you have your harmless error argument? Well, I don't. The harmless, well, because I do believe it's harmless. Just as I believe that the harmless error argument pertains to the Spanish translation situation. It's the same situation. We don't need to worry about that. And I might also say that, just briefly with the Spanish adequacy, that nobody asked the agent to actually go through the rights. The testimony, all the argument, all the fuss at the hearing was whether or not he could speak Spanish in a proper way. And the cross-examination by defense counsel was extensive, both at the hearing and also at the trial. It went on and on and on and on and on. And the jury certainly had the opportunity to determine whether or not this gentleman was qualified to speak the Spanish language. But nobody asked him to actually read the card one way, either in English or in Spanish. Now, with regard to the speech... Presumably, if the defense had said, okay, here's side two of the card, read that in Spanish and he read it, then the translator would have translated it in English, right? Sure. We still wouldn't know if he spoke Spanish, right, unless... Well, that's right. But, I mean, well, the interpreter wouldn't. You couldn't ask the interpreter to give an opinion as to whether he'd done it right. But, sure, you could have done that. But nobody asked him to do it. They didn't do that.  The defense didn't ask him to do it, either. Now, with regard to the speedy trial issue, clearly you've got a situation here where the district court at ER 39 simply said, do we have a trial date? No, we don't. I'm going to put the motions over. And defense counsel says, that's fine. And thereafter... Does it make a difference whether counsel has approved it or not? What if counsel said, I object? Would that have made a difference? It certainly would have, because then the court would have been placed in the situation of having to say, and I object because of the speedy trial. Yes, it would have, because then the court would have had to have set aside other cases or do something. But, I mean, in terms of the legal analysis, does counsel's objection to that have any consequences? Is the court at that point under an obligation to make the 70 days, or can the court say, well, I hear you're an objection counselor, but I'm telling you we're congested here, and I'm not going to hear it today? Well, the answer to that is yes. Then we would have a problem, because, again, the cases are clear. The court congestion is not an excuse. Maybe the question, just to put a finer point on it, is that the court's obligation to abide by the speedy trial unrelated to anything the defense counsel says. Well, that's true, but motions are routinely continued in any one of a number of cases with the agreement of all parties, and that's what happened here, that the motions were continued with the agreement of all parties. And sadly, there was no notice to anybody that defense counsel wanted to withdraw from that agreement until after the Speedy Trial Act or time it expired. So in other words, the court by that at that point in time was in no position to correct it, and because the motion, the motion to dismiss was filed on February the 18th with the statement that the trial should have occurred on or before January the 16th. So by then, it was almost a month out of compliance with the 70 days. And by that point in time, nobody could do anything about it. But before that, nobody had heard anything from the defense that this was going to be a problem and that, in fact, the evidentiary motions should have been heard earlier. Excuse me. And so it just occurs to us that if defense counsel agrees to a continuance on motions, on evidentiary motions, that unless something is said before the Speedy Trial Act time period expires, that there has to be some notice that there's going to be a withdrawal from that agreement. The clerk, the courtroom deputy there, after a not guilty plea is entered, doesn't he have to go to the trial?   And he has to go to the trial. But he doesn't set up a schedule on, you know, when motions are to be heard, when exhibits are to be exchanged, when the case is to go to trial. Yes, he does. They don't do that. No, they did. But in this case, that happened here. There was a motion-setting hearing in early November of 2002. And on November the 13th, the motions were filed, and they were set to be heard on December the 2nd. The December the 2nd hearing occurs, and they simply walk in. The judge says, have we got a trial date? No, we don't. I'm going to set, we're going to have a motion to eliminate. Yes. I'll put all the motions over until the, until the motion to eliminate date, which was on February the 25th, I believe. Then defense counsel says fine. Says it's fine. Government says fine. Yes. Everybody agrees to that. Well, I mean, the reality is there's always some subterfuge of this rolling motion, isn't there? Because of the Speedy Trial Act, we're going to keep it in motion, so to speak. Well, there certainly can be. I mean, if you consider that to be a subterfuge, then that puts some nefarious purpose on the judges to avoid somehow the Speedy Trial Act. But the point is the statute provides for that. And both the, when you see that the climber says that the, no matter how unreasonable or unnecessary the delay might seem, it's still okay under the statute. And the same thing, morales that we cite pertains to all motions, even those that might not have been necessary. So the statute provides for exactly what happened here. What do they do down there when, let's say, let's say the defense counsel insists on going to trial within the 70 days, and there's just no way that can be done, so it goes over, and then the case is dismissed. Is it dismissed with prejudice or just dismissed? What happens after that? It's my understanding that if that happens, it's dismissed without prejudice and the good, the reindictment is obtained. But I mean, if a, it's my understanding that if a defense attorney insists on coming to trial within 70 days, that things will, either the case will be transferred to another judge or some other accommodation will be made. They call a jury and swear a jury in or something will happen, but the trial will commence. Okay. Thanks. Thank you. You've already had 30 minutes. I mean, is there something just bursting in your head that you have to say? Well, yes, Your Honor. I could make what I hope is two brief points. All right. Thank you, Your Honor, very much. First, just as a clarification to the ER, the defense did ask or did propose to ask the agent to read the I-214 form, and that's on page 66 of the ER and then was cut off by the district court. So that's just a clarification. And then very briefly, it's not, quote, okay under Clymer to just continue motions if they're unreasonable or if there's no reason for it. Clymer didn't say that, and the Supreme Court didn't say that in Henderson. What the Supreme Court said was Congress didn't write into the Speedy Trial Act a reasonableness requirement. What Henderson said is we leave it to the district court's district plans to ensure reasonableness, to ensure that the subterfuge that Your Honor described doesn't take place. The Henderson court said we rely on the district court plans to make sure that motions are resolved in a timely fashion. And this district court plan calls for hearings on motions to be conducted as soon as possible. And that simply didn't occur. So it violated the district court plan, hence it violated the Speedy Trial Act. And so for that reason it should have been dismissed. Okay. Thank you very much. Thanks a lot. And we're going to adjourn. Are we going to take that in here? Yes, it takes just a couple minutes. Okay. All right. All right. So we'll be, that's number five, right? Let me count it. U.S. versus Swartz, right? Yeah. Okay. Got it. All right. We'll take a recess.
judges: Pregerson, McKeown,bybee